UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Criminal No. 11-CR-10394-RWZ |
| MICHAEL LEE, | ) ) ) | |
| Defendant. | ) ) ) | |

UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE PURSUANT TO SECTION 5K1.1

The United States of America submits this memorandum in advance of the sentencing of the defendant Michael Lee.  Simultaneously, the United States moves the Court to downwardly depart from the applicable advisory United States Sentencing Guidelines ("USSG") range of 41 to 51 months, pursuant to USSG § 5K1.1.

On January 11, 2012, Lee pleaded guilty to a two-count Information charging him with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 and mail fraud in violation of 18 U.S.C. § 1341.  The charges against Lee arose out of a substantial undercover operation by the Federal Bureau of Investigation (the "FBI"), in which an undercover FBI agent (the "UA") posed as a corrupt hedge fund manager willing to provide financing from his clients' funds to executives of publicly traded companies in exchange for a secret kickback.  Lee, who at the time was serving as the Chief Executive Officer of ZipGlobal Holdings, Inc. ("ZipGlobal"), agreed to participate in the scheme with the UA.  However, after his commission of the conduct which led to his conviction, Lee immediately accepted responsibility for his actions when approached by

FBI agents, and agreed to cooperate proactively in their investigation of other individuals. Accordingly, Lee's case merits, in the government's view, the Court's consideration of a punishment below what is suggested by the advisory Guidelines.

## BACKGROUND

The crimes for which Lee is to be sentenced resulted from an undercover operation launched by the Boston division of the FBI in 2010 which focused on preventing fraud in the microcap stock markets. Microcap companies are small, publicly traded companies whose stock often trades at pennies per share. The FBI was aware that the microcap markets, in part because they are loosely regulated, were rife with fraud, but it was also the case that such fraud was difficult to detect using more traditional law enforcement techniques. See United States v. Sneed, 34 F.3d 1570, 1578 (10th Cir. 1994) ("[s]ting operations, though necessarily deceptive, are an effective law enforcement tool to uncover securities fraud . . . gathering after-the-fact evidence of illegal manipulation of penny stocks would be an all but impossible task"). In light of these facts, the FBI set up an undercover operation in which the agency itself would be the intended victim, so as to avoid any harm befalling the investing public. More specifically, the UA posed as a manager of a major New York-based investment fund ("Seafin") who was willing to violate his duties to his investors by investing money—up to millions of dollars—in undeserving microcap companies, in exchange for a kickback from the executives of those companies.

On October 22, 2010, Lee met with the UA in Burlington, Massachusetts. At that meeting, the UA presented the kickback scenario to Lee, informing him that he could use his discretionary power to invest a portion of his clients' monies in order to fund ZipGlobal, but

2

would only do so if Lee sent him back a portion of the money as a kickback that Seafin would know nothing about. The kickback payments, the UA explained, would be disguised through the use of a sham consulting company that the UA controlled, and would be accompanied by phony invoices purporting to describe consulting services which would never actually occur. Lee agreed to enter into this arrangement with the UA at the same meeting, and, a few weeks later, Lee received the initial installment of ostensible funding from the FBI, in the form of a wire transfer of $33,800. On the same day, Lee sent $11,830 to the UA's sham consulting company, which represented the agreed-upon kickback. Thereafter, UA paid Lee 20% of the kickback, or $2,400, as a supposed "commission payment." At Lee's request, and in order to avoid a paper trail of the transaction, Lee received the $2,400 in cash.

 Pursuant to his agreement with the UA, Lee subsequently received two additional installments of funding—one for $39,975 and another for $40,000. In connection with each installment, Lee sent a portion of the money to UA's sham consulting company. As a further means of concealing the kickback, Lee agreed to receive invoices that reflected consulting services allegedly rendered to ZipGlobal, even though no such services were rendered. After each installment, UA paid Lee 20% of the kickback payment. Each such payment was made in cash.

 In addition to engaging in the kickback transactions on his own behalf, Lee agreed to, and did, introduce to the UA other executives of other publicly traded companies who were willing to—and did—engage in additional kickback transactions with the UA. In exchange for making these introductions, Lee was to receive, and did receive, a finder's fee, usually equal to twenty percent of the kickback. Between November 2010 and February 2011, Lee introduced seven

3

executives to the UA and he sat in on meetings between those executives and the UA in which the UA described the kickback arrangement. Three of the executives Lee introduced refused to enter into the kickback transactions. Four others agreed to, and did, pay the kickbacks and received a total of $190,000 in fraudulent "funding." Finally, in January 2011, Lee also introduced another individual, Edward Henderson, to the UA. As set forth further below, although Henderson did not control his own publicly held company, as Lee knew, Henderson had access to people who did and, after Lee's introduction, Henderson proceeded to introduce to the UA another series of executives who engaged in kickback transactions.

In addition to the $113,775 in fraudulent "funding" Lee received for himself and ZipGlobal, Lee received another $31,650 in commission payments based on the kickbacks he paid on behalf of ZipGlobal and the kickbacks paid by the executives he introduced to UA.

## ACCEPTANCE OF RESPONSIBILITY AND COOPERATION

In February, 2011, Lee was approached by FBI agents who confronted him with his participation in the kickback scheme, and he was offered the opportunity to cooperate with the agency. Lee immediately obtained counsel, met with the government, fully acknowledged his knowing participation in the scheme and agreed to cooperate proactively. Over the course of his cooperation, Lee agreed to consensually record conversations with a total of 22 different people—including the five individuals he previously had introduced into the scheme (four executives and Henderson)—as well as executives Henderson and others subsequently introduced.

Specifically, Lee consensually recorded conversations with Muhammad "M.J." Shaheed, Paul Desjourdy, James Wheeler, Edward Henderson, and Seijin Ki, all of whom were

4

subsequently charged and pleaded guilty in the District of Massachusetts. See United States v. Muhammad Shaheed, 12-CR-10014-DPW; United States v. Henderson, 11-CR-10393-WGY; United States v. Paul Desjourdy, 11-CR-10395-JLT; United States v. James Wheeler, 11-CR-10395-JLT; and United States v. Seijin Ki, 12-CR-10366-WGY.  Shaheed, the Chief Executive Officer of Augrid Global Holdings, Inc., pleaded guilty on the eve of trial and was sentenced to 24 months incarceration, a sentence in the middle of the applicable Guidelines Sentencing Range ("GSR").  Although the government did not intend to call Lee as a witness at Shaheed's trial, he was identified as a defense witness and met with the government in advance of that trial.  Ki, the Chief Executive Officer of two publicly traded companies, pleaded guilty in advance of trial and was sentenced to 15 months incarceration, a sentence at the low end of the applicable GSR.

Henderson subsequently agreed to cooperate with the government's ongoing investigation and pleaded guilty to an Information charging him with wire fraud.  The full extent of Henderson's cooperation is set forth in the government's sentencing memorandum, Dkt. No. 26.  See Henderson, 11-CR-10393-WGY.

Paul Desjourdy and James Wheeler similarly agreed to cooperate with the government's investigation.  Although neither defendant cooperated proactively, both agreed to testify against another defendant and the government believes that their agreement to testify against that defendant ultimately influenced her decision to plead guilty.  The full extent of Desjourdy's and Wheeler's cooperation is set forth in the government's sentencing memoranda in those cases. See Desjourdy, 11-CR-10396-JLT, Dkt. No. 33; and Wheeler, 11-CR-10395-JLT, Dkt. No. 33.

In addition to the cases that were prosecuted in the District of Massachusetts, Lee also consensually recorded conversations with Kevin Brennan, who was charged in a similar sting

operation in Miami and was convicted after trial.[1]  See United States v. Kevin Brennan, et al., 02-60064-RWG (MD Fla).

Lee's proactive, covert cooperation lasted for a period of nine months, during which time he had regular contact with his FBI handlers.  Lee, for the most part, followed the direction of his handlers, with one notable exception.  Specifically, towards the end of his proactive cooperation, the FBI questioned Lee about why he had not consensually recorded any conversations with a friend Lee previously had introduced to the UA for the purpose of engaging in a kickback transaction.  Although that friend refused to do the deal, Lee had been specifically instructed to record any conversations he had with that individual while Lee was cooperating with the government.  In response to repeated questioning by the FBI, Lee claimed he had not spoken with this friend during the entire time of his proactive cooperation and went so far as to leave a message for the friend in the presence of FBI agents which message suggested that the two had not spoken for months.

After Lee's FBI handler confronted Lee again and advised that the FBI intended to review Lee's telephone records, Lee finally admitted to having had one "quick" call with the friend.  The FBI later reviewed his records and determined that Lee had, in fact, had two telephone calls with the friend.  In light of his response to additional questioning, the government became, and remains, concerned that Lee had in fact told his friend about the undercover operation.

---

[1] The government is filing a sealed supplemental memorandum describing additional cooperation provided by Lee.

## GUIDELINES CALCULATION

The government agrees with the calculations in the Pre-Sentence Report ("PSR") with regard to the base offense level, the adjustment for loss, and the adjustment based on Lee's status as an officer of ZipGlobal at the time he committed this securities fraud.  See PSR, ¶¶ 31-34.  In addition to the adjustments adopted by the Probation officer, however, both parties also agree that Lee should receive a two level upward adjustment for his role in the offense.  See USSG §3B1.1(c).  This role adjustment is appropriate because, after Lee engaged in his own kickback transactions with his own company, he recruited others to participate in the same scheme.  Indeed, Judges Gorton and Young, when sentencing "introducing brokers," like Lee, both agreed with the government's position that the role adjustment should apply.  See United States v. Prange, et al., 11-CR-10415-NMG (applying two level role adjustment for defendant who introduced other executives into scheme); Henderson, 11-CR-10393-WGY (same).  The government also agrees that Lee is entitled to the full three level downward adjustment for acceptance of responsibility.[2]  It is the government's position, therefore, that the appropriate Guidelines calculation is as follows:

---

[2] The government does not believe that the sophisticated means enhancement applies in this case.

| | |
|---|---|
| Base offense level (USSG §2B1.1(a)(1)) | +7 |
| Adjustment for loss of greater than $200,000 (USSG §2B1.1(b)(1)(G))[3] | +12 |
| Adjustment for role as officer of ZipGlobal during commission of securities fraud (USSG §2B1.1(b)(18)) | +4 |
| Adjustment for role as an organizer or leader of a criminal activity (USSG §3B1.1(c)) | +2 |
| Adjustment for acceptance of responsibility ((USSG §3E.1.1) | -3 |
| Total adjusted offense level | 22 |

## GOVERNMENT'S SENTENCING RECOMMENDATION

Although Lee's advisory Guidelines Sentencing Range provides for a sentence of 41-51 months incarceration, the government respectfully suggests that a sentence of 15 months incarceration is appropriate in this case. There are several reasons underlying this recommendation. The crimes of conviction are, to be sure, grave ones, and the serious nature of the charges is reflected in the sentences imposed on defendants convicted of participating in the same undercover operation who did not cooperate with the government.[4] However, it also bears mentioning that the crime in question is one that, had it occurred outside of the auspices of an

---

[3] As noted in the PSR, the loss attributable to Lee's conduct includes the fraudulent funding that Lee received for ZipGlobal, as well as the funding received by the executives he introduced into the scheme. See PSR, ¶ 32. The other Judges considering the losses attributable to both executives and introducing brokers, like Lee, have agreed with the Probation Office's method of calculating the loss in these cases.

[4] As noted, Shaheed, who pled guilty on the eve of trial without a plea agreement, received a sentence of 24 months of incarceration, see United States v. Shaheed, 12-CR-10014-DPW; James Prange and J.C. Jordan, both convicted after trial, received sentences of 30 months imprisonment, see Prange et al., 11-CR-10415-NMG, and Steven Berman and Richard Kranitz, both of whom pleaded guilty before trial received Guidelines sentences of 18 months incarceration. See id. Seijin Ki received a sentence of 15 months incarceration. See Ki, 12-CR-10366-WGY. All of these sentences were within the applicable GSR.

FBI undercover operation, would be exceedingly difficult to detect, much less investigate. Securing the cooperation of participants in such schemes, like Lee, is critical to the law enforcement mission of uncovering the nefarious conduct of others—particularly as it is not always feasible to set up elaborate undercover operations such as the one that was in effect here. Moreover, Lee's immediate agreement to cooperate not only evidences an extraordinary acceptance of responsibility for his actions, but also, in itself, allowed the FBI to pursue investigatory avenues which it could not have undertaken had Lee delayed his decision to assist law enforcement. As such, a sentenced of no more than 15 months incarceration here would serve the ends of justice by communicating to wrongdoers that, if they have engaged in crime, the appropriate response is to own up to their actions and, if presented with the opportunity, to fully assist law enforcement in its efforts to bring other wrongdoing to light.

     The government recognizes that, in accordance with the government's recommendations, other cooperating defendants have received probationary sentences, see Henderson, 11-CR-10393-WGY; Wheeler, 11-CR-10395-JLT; Desjourdy, 11-CR-10396-JLT; and Gilbreath, 12-CR-10186-FDS. But Lee is not similarly situated to those defendants, none of whom engaged in any type of deception during their cooperation. Obviously, when someone, like Lee, makes the decision to cooperate with the government that person must be candid and truthful at all times. When a cooperating witness engages in unauthorized conduct (such as failing to record conversations with individuals engaged in illegal, or potentially illegal, conduct) and is untruthful with the government, that diminishes the government's ability to rely on them to gather evidence. Indeed, in contrast to the four other cooperating witnesses identified above, the government never intended to call Lee as a witness in any trial. Thus, while Lee's cooperation

merits consideration and should be reflected in his sentence, the Court should also send a message to Lee, and to other cooperator witnesses that, once they have made the decision to cooperate—in anticipation of a benefit to themselves—anything short of full and complete candor is unacceptable.  The government is not recommending a probationary sentence because one is not warranted where, as here, the defendant engaged in at least some deceptive conduct during his cooperation.

    For the reasons set forth above, the government respectfully requests that the Court grant its motion for a downward departure and impose a sentence of 15 months of incarceration.

                                                 Respectfully submitted,

                                                 CARMEN M. ORTIZ
                                               United States Attorney

                          By:    /s/ Sarah E. Walters
                                SARAH E. WALTERS
                                Assistant U.S. Attorney

Dated: February 1, 2014

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: February 1, 2014

/s/ Sarah E. Walters
SARAH E. WALTERS